IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ELIZABETH ARMOUR and JULIE CASTRO,<br><br>      Plaintiffs,<br><br>    v.<br><br>HOMER TREE SERVICES, INC., HOMER TREE CARE, INC., HOMER INDUSTRIES, LLC, HOMER MANAGEMENT, LLC, and RONALD REPOSH, individually,<br><br>      Defendants.<br>―――――――――――――――――<br>HOMER MANAGEMENT, LLC, and HOMER TREE SERVICE, INC.,<br><br>      Counterclaimants,<br><br>    v.<br><br>ELIZABETH ARMOUR,<br><br>      Counterdefendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br><br>15 C 10305<br><br>Judge John Z. Lee |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Elizabeth Armour ("Armour") and Julie Castro ("Castro") bring this action against Defendants Homer Tree Service, Inc.,[1] Homer Tree Care, Inc., Homer Industries, LLC, Homer Management, LLC, (together, "the Homer Companies"),

---

[1] Defendants indicate that "Homer Tree Services," which Plaintiffs name in their complaint as such, is not in fact the entity's correct name (which is in fact Homer Tree Service, without an "s"). Indeed, the Illinois Secretary of State lists "Homer Tree Service" as the entity's name. Defs.' LR 56.1(a)(3) Stmts. J.A., Ex. D, ECF No. 152. The Court will therefore refer to the entity as Homer Tree Service.

and Ronald Reposh ("Reposh"). Plaintiffs claim they were fired from their jobs at the Homer Companies in retaliation for speaking out against racially discriminatory hiring practices, in violation of 42 U.S.C. § 1981. They also assert that they were fired for refusing to participate in activities that would violate various laws, rules, and regulations, as prohibited by the Illinois Whistleblower Act, 740 Ill. Comp. Stat. 174/20. For her part, Armour further alleges that Defendants breached her employment contract and that Reposh sexually assaulted and battered her, for which she seeks to hold the Homer Companies liable. In turn, Homer Tree Service and Homer Management have filed various counterclaims against Armour, including breach of fiduciary duty, unjust enrichment, and conversion.

Defendants seek partial summary judgment on Armour's complaint, and Counterclaimants Homer Tree Service and Homer Management seek summary judgment on their breach of fiduciary duty, unjust enrichment, and conversion counterclaims. Defendants also seek summary judgment on Castro's complaint in its entirety. For the reasons that follow, the motions [146] [149] are granted in part and denied in part.

<u>Background</u>[2]

## I.   Plaintiffs' Hiring and the Nature of Their Employment

Plaintiffs are former employees of one or more of the Homer Companies. *See* Defs.' LR 56.1(a)(3) Stmt. (Armour) ¶ 12, ECF No. 148; Defs.' LR 56.1(a)(3) Stmt. (Castro) ¶ 5, ECF No. 151. Armour was hired on July 7, 2014, by Reposh. Defs.' LR

---

[2]    The following facts are undisputed unless noted otherwise.

56.1(a)(3) Stmt. ("Armour") ¶¶ 12, 32.  At all times relevant to this dispute, Reposh served as president of Homer Tree Service, Homer Tree Care, and Homer Management, and managing member of Homer Industries.  *Id.* ¶ 7.

Upon her hiring, Armour entered into an employment agreement with Homer Tree Service to serve as its Chief Executive Officer.  *Id.* ¶ 13.  The agreement provides that "[Homer Tree Service] and its affiliate companies are desirous of engaging the services of [Armour] to operate, coordinate, and manage the office and financial affairs of [Homer Tree Service] and its affiliate companies."  Pls.' LR 56.1(b)(3)(C) Stmt. ¶ 2, ECF No. 155; Defs.' LR 56.1(a)(3) Stmts. J.A., Ex. A (Armour Dep. (8/26/16)), Ex. 4.  As CEO, Armour reported to Reposh, and Reposh afforded Armour substantial discretion in carrying out her duties.  Defs.' LR 56.1(a)(3) Stmt. (Armour) ¶ 39.

Homer Tree Service, along with Homer Tree Care and Homer Industries, paid Armour's salary through January 2015.  *Id.* ¶ 38.  Armour's employment agreement remained with Homer Tree Service throughout her employment; however, in January 2015, she became CEO of Homer Management, which paid her salary thereafter.  *Id.* ¶¶ 6, 53–54.[3]  Homer Management "provides support to several of the other companies" and "was created to manage the other companies and their payrolls."  Defs.' LR 56.1(a)(3) Stmt. (Armour) ¶¶ 6, 55.  Despite this,

---

[3]     Armour denies that Homer Management was exclusively responsible for her salary, and testified in her deposition that she was paid "via intercompany transfer."  Pl. Armour's LR 56.1(b)(3)(B) Stmt. ¶ 54, ECF No. 153; *see* Armour Dep. (8/26/16) at 167:19–168:2.  She admits, however, that the payments themselves came from Homer Management, Defs.' LR 56.1(a)(3) Stmts. J.A., Ex. EE, ¶ 8, and has adduced no evidence, other than her testimony, that an intercompany transfer occurred.

Armour received certain payments from the other Homer Companies in January 2016. Pls.' LR 56.1(b)(3)(C) Stmt. ¶ 6.[4]

Armour hired Castro to serve as Director of Human Resources on October 7, 2014. Defs.' LR 56.1(a)(3) Stmt. (Castro) ¶¶ 5, 7. Castro was initially hired as an employee of Homer Tree Service. *Id.* ¶ 5. Like Armour, however, her position was moved under Homer Management in January 2015, and Homer Management paid her thereafter. *Id.* ¶¶ 7–8. Castro, for her part, asserts that "she [ ] was the Director [of Human Resources] for all of the Homer entities," and testified that she did work for all of them. Pl. Castro's LR 56.1(b)(3)(B) Stmt. ¶ 7; *see* Defs.' LR 56.1(a)(3) Stmts. J.A., Ex. C (Castro Dep.) at 82:1–4.

The parties dispute various facts concerning Plaintiffs' qualifications at the time of their hiring. Defendants claim that Armour misrepresented to Reposh that she had obtained a bachelor's degree from DePaul University, and that this fact was crucial to his decision to hire her. Defs.' LR 56.1(a)(3) Stmt. (Armour) ¶¶ 31–33, 90, 92. Armour, however, maintains that, prior to her hiring, she informed Reposh that she had not yet formally obtained her bachelor's degree. She claims that Reposh responded by telling her that this would not be an issue and she should nevertheless indicate that she had a bachelor's degree on her resume. Pl. Armour's LR 56.1(b)(3)(B) Stmt. ¶¶ 31–33, 90, 92;[5] *see* Armour Dep. (8/26/16) at 127:8–23. As

---

[4] The parties dispute whether these payments were reimbursements for work-related expenses. Defs.' Resp. Pls.' LR 56.1(b)(3)(C) Stmt. ¶ 6, ECF No. 164.

[5] Defendants object to these and other responses and statements of facts by Plaintiffs on the basis that Plaintiffs "fail[ ] to provide pinpoint citations to the exact portions of deposition testimony relied upon, instead opting to cite to entire pages of deposition

for Castro, Defendants claim that she misrepresented on her resume that she was responsible for managing human resources at Home Depot, that she therefore was not qualified, and that Armour hired her anyway. *See* Defs.' LR 56.1(a)(3) Stmt. (Castro) ¶¶ 9–10. For her part, Castro asserts that she in fact was tasked with managing human resources at Home Depot. *See* Pl. Castro's LR 56.1(b)(3)(B) Stmt. ¶¶ 9–10.

## II. Events Occurring During Plaintiffs' Employment

According to Plaintiffs, a number of unlawful practices occurred at Homer during their terms of employment.[6] Plaintiffs' objection to and refusal to participate in these practices preceded their termination.

### A. Reposh's Alleged Discriminatory Hiring Practices

First, Plaintiffs claim that, during their employment, Reposh told them "on various occasions" that he did not want African-Americans working for the Homer

---

transcripts." Defs.' Reply (Armour) at 2, ECF No. 163; *accord* Defs.' Reply (Castro) at 2, ECF No. 162. But, while Northern District of Illinois Local Rule 56.1 requires "specific references" to the record in support of factual assertions, this does not bar citation to entire pages of deposition transcripts, especially where, as here, the pages cited contain support for the assertion at issue. *Cf. Ammons v. Aramark Unif. Servs., Inc.*, 368 F.3d 809, 817–18 (7th Cir. 2004) ("Citations to an entire *transcript* of a deposition . . . are not specific and are, accordingly, inappropriate.") (emphasis added); *accord Malec v. Sanford*, 191 F.R.D. 581, 583 (N.D. Ill. 2000). The Court therefore declines to exclude facts simply because Plaintiffs cite to entire pages of deposition transcripts.

[6] In addition to the practices discussed in this section, Plaintiffs offer a number of facts in support of their belief that other unlawful practices occurred at the Homer Companies. *See generally* Pls.' LR 56.1(b)(3)(C) Stmt. ¶¶ 48–59, 62–68. But, as explained *infra*, Plaintiffs cannot proceed with their claims predicated on these practices even if the Court were to credit their version of events. Thus, the Court refrains from discussing these facts and Defendants' voluminous objections to them. In addition, Armour claims that Reposh assaulted and battered her at various times during her employment. *See id.* ¶¶ 69–70. For purposes of the present motion, however, the Court need not discuss these facts.

Companies because of their race.  Pls.' LR 56.1(b)(3)(C) Stmt. ¶ 10.[7]  Defendants dispute that Reposh made this statement or that he refused to hire African-Americans because of their race.  Defs.' Resp. Pls.' LR 56.1(b)(3)(C) Stmt. ¶ 10. Plaintiffs further assert that they "repeatedly advised Reposh that his racist views and discriminatory practices were unlawful . . . and that they could not follow his illegal directives."  Pls.' LR 56.1(b)(3)(C) Stmt. ¶ 12.  In response to Plaintiffs' complaints, Reposh purportedly "berated" Plaintiffs angrily, threatened them with termination, and "attempted to undermine them in retaliation."  *Id.* ¶ 13. Defendants dispute that Reposh threatened Plaintiffs with termination.  Defs.' Resp. Pls.' LR 56.1(b)(3)(C) Stmt. ¶ 13.[8]

---

[7]  Defendants object to this and a number of other of Plaintiffs' assertions on the ground that they are not "concise, short" statements as envisioned by LR 56.1. *E.g.*, Defs.' Resp. Pls.' LR 56.1(b)(3)(C) Stmt. ¶ 10.  The Court, however, deems those of Plaintiffs' facts included in this opinion sufficiently concise and short to fall within the bounds of the rule. Second, Defendants argue that this and a number of Plaintiffs' other factual assertions contain inadmissible hearsay because they offer Reposh's out-of-court statements for their truth. *E.g., id.*  But Reposh's statements are admissible as party admissions under Federal Rules of Evidence 801(d)(2)(A) and 801(d)(2)(D).  Finally, Defendants lodge a blanket challenge to a number of Plaintiffs' responses and statements of facts on the ground that they are "unresponsive and unsupportive," Defs.' Reply (Armour) at 2; Defs.' Reply (Castro) at 3, and object to them "to the extent [they] assert[ ] facts not supported by the record evidence, misstate[ ] the cited record, and fail[ ] to adequately cite to the record evidence," *e.g.*, Defs.' Resp. Pls.' LR 56.1(b)(3)(C) Stmt. ¶ 10.  The Court, however, has reviewed each of Plaintiffs' factual assertions and relied only on those facts adequately supported by admissible evidence contained in one or more of Plaintiffs' cited sources.

[8]  The parties dispute whether any qualified African-American employees were in fact denied employment because of their race during Plaintiffs' employment.  *See* Defs.' LR 56.1(a)(3) Stmt. (Armour)¶ 45; Pl. Armour's LR 56.1(b)(3)(B) Stmt. ¶ 45; Defs.' LR 56.1(a)(3) Stmt. (Castro) ¶ 26; Pl. Castro's LR 56.1(b)(3)(B) Stmt. ¶ 26; *compare* Armour Dep. (8/26/16) at 40:17–22, *with* Defs.' LR 56.1(a)(3) Stmts. J.A., Ex. F (Reposh Dep.), at 201:12–17.

Plaintiffs cannot identify any specific time they spoke out against Reposh's discriminatory hiring practices other than February 2015. Defs.' LR 56.1(a)(3) Stmt. (Armour) ¶ 52; Defs.' LR 56.1(a)(3) Stmt. (Castro) ¶ 53. In February 2015, Plaintiffs describe a meeting that occurred at which both of them, along with Reposh, were present. Pls.' LR 56.1(b)(3)(C) Stmt. ¶ 14; *see* Castro Dep. at 49:9–53:24. At that meeting, Castro gave Reposh resumes and applications she had obtained at a job fair. Castro Dep. at 49:9–16. Castro claims that Reposh instructed Plaintiffs that "[they] were not to consider [the applicants] because most applicants were African-American." *Id.* at 52:8–12. Castro testified that she told Reposh, "[w]e have to consider them." *Id.* at 53:6–10. She further claims that, following the meeting with Reposh, she forwarded the resumes and applications to Aaron Hocking, a manager at one of the Homer Companies, told him that there were many qualified applicants in the group, and "left him to review them." *Id.* at 50:14–23. Defendants dispute Plaintiffs' account of the meeting on various grounds. Defs.' Resp. Pls.' 56.1(b)(3)(C) Stmt. ¶ 14. Notwithstanding what occurred at this meeting, Plaintiffs concede that they never interviewed, hired, or otherwise considered any African-American applicants during their tenure. Pl. Armour's LR 56.1(b)(3)(B) Stmt. ¶ 47; Pl. Castro's LR 56.1(b)(3)(B) Stmt. ¶¶ 31–32, 56.

Several months later, on August 17, 2015, Hocking hired Taurus Moore, an African-American applicant. Defs.' LR 56.1(a)(3) Stmt. (Armour) ¶ 43; Defs.' Resp. Pls.' LR 56.1(b)(3)(C) Stmt. ¶ 18; Defs.' LR 56.1(a)(3) Stmts. J.A., Ex. BB, at 11. Moore is the only African-American applicant that Defendants have identified by name as being hired by the Homer Companies during Plaintiffs' employment. *See*

7

Defs.' LR 56.1(a)(3) Stmt. (Armour) ¶ 43; Defs.' LR 56.1(a)(3) Stmt. (Castro) ¶ 24.[9]
Plaintiffs were not involved in interviewing and hiring Moore. Defs.' LR 56.1(a)(3)
Stmt. (Armour) ¶ 44; Defs.' LR 56.1(a)(3) Stmt. (Castro) ¶ 25.[10] Castro attested that
she could not recall whether Moore's resume or application was in the resumes from
the job fair discussed in February 2015, but that she forwarded his online
application at a later date to Hocking, who in turn reviewed it and made the
decision to interview and hire him. Castro Dep. at 58:22–59:22. One day after
Moore was hired, on August 18, 2015, Reposh instructed Armour to fire Castro.
Pls.' LR 56.1(b)(3)(C) Stmt. ¶ 47; *see also* Defs.' LR 56.1(a)(3) Stmt. (Castro) ¶ 75.
According to Castro, Armour did not provide a reason, but explained that she was
merely following Reposh's instructions. Pl. Castro's LR 56.1(b)(3)(B) Stmt. ¶ 75[11];
Castro Dep. at 220:8–14. Shortly thereafter, on August 21, 2015, Reposh fired
Armour. Pls.' LR 56.1(b)(3)(C) Stmt. ¶ 77; *see also* Defs.' LR 56.1(a)(3) Stmt.
(Armour) ¶ 69.

---

[9]    Defendants claim that "at least one African-American was hired at Homer
Environmental" during Armour's employment, but name no other such employee. Defs.' LR
56.1(a)(3) Stmt. (Armour) ¶ 43; Defs.' LR 56.1(a)(3) Stmt. (Castro) ¶ 24. In addition, the
record reflects that a number of African-Americans were assigned by another company to
work for Homer Environmental, and that Hocking hired a number of temporary African-
American workers from that same company to meet seasonal business demands. Defs.' LR
56.1(a)(3) Stmt. (Armour) ¶ 46; Defs.' LR 56.1(a)(3) Stmt. (Castro) ¶ 27.

[10]    Plaintiffs dispute this fact, but the deposition testimony to which they cite
establishes that Hocking hired Moore, Armour Dep. (8/26/16) at 43:13–14, and that Castro's
involvement was limited to processing Moore's onboarding paperwork, Castro Dep. at
59:14–19, 65:1–3. This fact is therefore deemed admitted.

[11]    This response is listed as corresponding to paragraph 74 of Defendants' statement of
facts, but in fact corresponds to paragraph 75.

## B. Reposh's Purported Instructions to Terminate Employees Invoking Workers' Compensation

At some point around July 27, 2015, according to Plaintiffs, Reposh directed them to "terminate injured employees upon their return to work or else make them as uncomfortable [*sic*] to foment their departures (such as turning off the air conditioning)." Pls.' LR 56.1(b)(3)(C) Stmt. ¶¶ 43, 45. Reposh disputes that he gave any such directive. Defs.' Resp. Pls.' 56.1(b)(3)(C) Stmt. ¶¶ 43, 45. In August 2015, Plaintiffs contacted the Homer Companies' counsel with their concerns about Reposh's practices. Pls.' LR 56.1(b)(3)(C) Stmt. ¶ 46. According to them, counsel wrote a memo confirming their belief that Reposh's directive was unlawful. *Id.*[12] At some point after August 13, 2015, Plaintiffs told Reposh that they had contacted counsel and provided Reposh with counsel's memorandum. Pls.' LR 56.1(b)(3)(C) Stmt. ¶ 46. Reposh "became upset." *Id.* Defendants dispute Plaintiffs' account on various grounds. Defs.' Resp. Pls.' 56.1(b)(3)(C) Stmt. ¶ 46.

## C. Reposh's Purported Directive to Terminate an Employee Who Complained About a Ventilation Issue

Armour also claims that Reposh instructed her to terminate Homer employee Matt Lovas, who complained about a ventilation issue at a shop affiliated with the Homer Companies. Armour asserts that, on August 17, 2015, she spoke with

---

[12] Defendants contend that this assertion relies on communications or documents protected by attorney-client privilege. Defs.' Resp. Pls.' LR 56.1(b)(3)(C) Stmt. ¶ 46. But it does not appear that Plaintiffs seek to admit the contents of any such communication or document, and in any case, the Court admits only the fact that Plaintiffs contacted counsel and provided counsel's memorandum to Reposh. What is more, because Armour and Castro contacted counsel, presumably they would hold the privilege and they (not Defendants) could invoke it. *See generally United States v. Evans*, 113 F.3d 1457, 1461 (7th Cir. 1997). In addition, by disclosing the communication to Reposh, they likely surrendered the privilege. *Id.*

Reposh about Lovas.  Pls. LR 56.1(b)(3)(C) Stmt. ¶ 60.[13]  No Occupational Health and Safety Act (OSHA) violations or citations were ever issued in connection with the ventilation issue, however.  Defs.' LR 56.1(a)(3) Stmt. (Armour) ¶ 98.  That said, a mock inspection conducted prior to Lovas's complaint "found that additional exposure testing would be required to determine the efficacy of the current ventilation system in the shop."  *Id.* ¶ 99.  Reposh purportedly told Armour that "Lovas was a trouble-maker who should be fired."  Pls. LR 56.1(b)(3)(C) Stmt. ¶ 61.  Armour refused to fire him.  *Id.*  Defendants dispute Armour's account of what occurred and whether Lovas ever made the complaint at issue.  *See* Defs.' Resp. Pls.' LR 56.1(b)(3)(C) Stmt. ¶ 60.

## III.    Plaintiffs' Termination

As noted previously, on August 18, 2015, Reposh instructed Armour to fire Castro, which she did.  Pls.' LR 56.1(b)(3)(C) Stmt. ¶ 47; *see also* Defs.' LR 56.1(a)(3) Stmt. (Castro) ¶ 75.  Three days later, on August 21, 2015, Reposh fired Armour.  Pls.' LR 56.1(b)(3)(C) Stmt. ¶ 77; *see also* Defs.' LR 56.1(a)(3) Stmt. (Armour) ¶ 69.  According to Defendants, Castro was terminated because she was unqualified to perform her duties as Director of Human Resources despite representing otherwise, and she exceeded the number of permissible absences during the time she worked

---

[13]    Defendants object to this fact on the basis that Lovas's complaint is hearsay.  Defs.' Resp. Pls.' LR 56.1(b)(3)(C) Stmt. ¶ 60.  Hearsay is a statement that "a party offers in evidence to prove the truth of the matter asserted in the statement."  Fed. R. Evid. 801(c)(2).  Lovas's complaint is not offered for the truth of the matter asserted—*i.e.*, that there was in fact a ventilation issue—but to prove the fact that he made a complaint, and that Armour and Reposh were on notice of his complaint.  Thus, it is not hearsay.  Moreover, the fact would not lack foundation or personal knowledge, because Armour purportedly spoke with Lovas.

for Homer Management. Defs.' LR 56.1(a)(3) Stmt. (Castro) ¶ 75. Castro disputes these assertions and denies that they were the true reasons for her termination. First, she contends that she was qualified because she performed human resources management at Home Depot prior to being hired. Pl. Castro's LR 56.1(b)(3)(B) Stmt. ¶¶ 9, 75; *see* Castro Dep. at 195:9–15. She also denies that she exceeded her allowable leave, pointing out that Homer Management paid out some of her remaining leave balance upon her termination. Pl. Castro's LR 56.1(b)(3)(B) Stmt. ¶¶ 71,[14] 75; *see* Castro Dep. at 222:5–21, 223:7–11.

With respect to Armour, Defendants assert that Reposh's decision to terminate her "stemmed from several breaches of her Employment Agreement, in addition to other instances of misconduct and [a] substantial decrease in employee morale that occurred during her reign." Defs.' LR 56.1(a)(3) Stmt. (Armour) ¶ 71. "Among other things, Armour forwarded confidential information to her personal email address and disclosed confidential information to several third parties, obtained tuition reimbursement to which she was not entitled, purchased a new fuel management system—without authorization—for which the company had to pay a restocking fee, improperly accessed Reposh's company email account, deleting and altering an email therein, ordered surveillance on personal acquaintances and other employees, and directed [another Homer employee] to increase the hours in [her] PTO bank prior to termination." *Id.* ¶ 72. This purported misconduct occurred throughout Armour's employment, beginning as early as 2014. *Id.* ¶¶ 75, 80. For

---

[14]    This response is listed as corresponding to paragraph 70 of Defendants' statement of facts, but in fact corresponds to paragraph 71.

her part, Armour concedes that company morale decreased during her tenure and that certain employees complained about her management as CEO. Pl. Armour's LR 56.1(b)(3)(B) Stmt. ¶¶ 64, 66. With two exceptions,[15] however, she disputes the other stated reasons for her termination. Pl. Armour's LR 56.1(b)(3)(B) Stmt. ¶¶ 71–72. She also denies that these reasons were the actual basis for her termination. *Id.* Among other things, she observes that, on July 16, 2015, just over one month before her termination, Reposh threw a party to commemorate her one-year work anniversary with the Homer Companies. Defs.' LR 56.1(a)(3) Stmt. (Armour) ¶ 67.[16]

Armour's employment agreement stated in part: "[t]his Agreement may be terminated by either party before the end of the term with or without cause, by giving thirty (30) days written notice. If [Homer Tree Service] terminates [Armour] without cause, it shall pay [her] the equivalent of four (4) months of her current salary." Defs.' LR 56.1(a)(3) Stmt. (Armour) ¶ 14; Armour Dep. 8/26/16, Ex. 4, at 4–5. Upon her termination, Armour did not receive any severance pay. Defs.' LR 56.1(a)(3) Stmt. (Armour) ¶ 23; *see* Defs.' LR 56.1(a)(3) Stmts. J.A., Ex. MM, at 7.

---

[15]    Armour concedes that she altered one of Reposh's emails, and admits that she ordered a background check on a non-employee and surveillance on certain employees. Pl. Armour's LR 56.1(b)(3)(B) Stmt. ¶¶ 82, 84; *see* Armour Dep. (8/26/16) at 216:4–15, 225:16–22.

[16]    The parties dispute the purpose of the party. Pl. Armour's LR 56.1(b)(3)(B) Stmt. ¶ 67. Armour believes it was to celebrate her work performance, while Defendants claim it was solely to boost company morale. *Id*; *see* Armour Dep. (8/26/16) at 157:9–17.

## Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Shell v. Smith*, 789 F.3d 715, 717 (7th Cir. 2015). To survive summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, he must "establish some genuine issue for trial such that a reasonable jury could return a verdict in [his] favor." *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012). In reviewing a motion for summary judgment, the Court gives the nonmoving party "the benefit of conflicts in the evidence and reasonable inferences that could be drawn from it." *Grochocinski v. Mayer Brown Rowe & Maw, LLP*, 719 F.3d 785, 794 (7th Cir. 2013). The Court must not make credibility determinations or weigh conflicting evidence. *McCann v. Iroquois Mem'l Hosp.*, 622 F.3d 745, 752 (7th Cir. 2010).

## Analysis

Plaintiffs' First Amended Complaint comprises the following counts: § 1981 retaliation claim asserted by Armour against all Defendants (Count I); violation of § 20 of the IWA claim by Armour against the Homer Companies (Count II); breach of employment contract claim by Armour against Homer Tree Service (Count III); assault and battery claim by Armour against Reposh (Count IV); assault and battery claim by Armour against the Homer Companies (Count V); § 1981 retaliation claim asserted by Castro against Homer Tree Service, Homer

Management, and Reposh (Count VI); and violation of § 20 of the IWA claim by Castro against Homer Tree Service and Homer Management. In their motions, Defendants seek summary judgment as to all counts except Count IV.

## I. Armour

### A. Retaliation in Violation of 42 U.S.C. § 1981

In Count I of Plaintiffs' amended complaint, Armour claims that she was terminated in retaliation for opposing Reposh's policy of refusing to consider African-American candidates for employment because of their race. 42 U.S.C. § 1981 "protects the right of all persons 'to make and enforce contracts' regardless of race." *Carter v. Chi. State Univ.*, 778 F.3d 651, 657 (7th Cir. 2015) (quoting 42 U.S.C. § 1981(a)). Section 1981, like Title VII of the Civil Rights Act of 1964, 42 U.S.C § 2000e *et seq.*, encompasses retaliation claims. *CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 457 (2008). Retaliation claims under § 1981 and Title VII are evaluated under the same framework. *Baines v. Walgreen Co.*, 863 F.3d 656, 661 (7th Cir. 2017). "Retaliation occurs 'when an employer takes an adverse employment action against an employee for opposing impermissible discrimination.'" *Carter*, 778 F.3d at 657 (quoting *Smith v. Bray*, 681 F.3d 888, 896 (7th Cir. 2012)).

In addition to employers, individual employees who participate in retaliatory conduct can also be liable under § 1981. *Id.* A § 1981 retaliation claim requires the plaintiff to prove that (1) she engaged in protected activity, (2) she suffered an adverse employment action, and (3) a causal connection between the protected activity and adverse employment action. *Id.* At summary judgment, there is no

14

distinction between direct or indirect evidence of causation; rather, the court must simply inquire whether a reasonable factfinder could conclude that a plaintiff's protected activity caused the adverse employment action. *Williams v. Office of Chief Judge of Cook Cty.*, 839 F.3d 617, 626 (7th Cir. 2016) (citing *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 764 (7th Cir. 2016)).[17]

### 1. Homer Tree Care and Homer Industries as Joint Employers

Defendants first move for summary judgment on behalf of Homer Tree Care and Homer Industries, arguing that Armour has not provided evidence from which a reasonable jury could conclude that Homer Tree Care and Homer Industries employed Armour. They therefore argue that Homer Tree Care and Homer Industries cannot be held to have retaliated against her under § 1981. In the Title VII context—and, by extension, under § 1981[18]—"multiple entities may be considered an employee's 'employer.'" *Tamayo v. Blagojevich*, 526 F.3d 1074, 1088

---

[17]     The *McDonnell Douglas* framework, under which a plaintiff must demonstrate that "(1) she engaged in statutorily protected activity; (2) she met her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) she was treated less favorably than similarly situated employees who did not engage in statutorily protected activity," *Boston v. U.S. Steel Corp.*, 816 F.3d 455, 464 (7th Cir. 2016), remains a valid, but nonexclusive, method of proving a retaliation claim, *see David v. Bd. of Trustees of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017). Here, Armour does not attempt to prove her claim by way of the *McDonnell Douglas* framework.

[18]     Section 1981, unlike Title VII, does not contain the term "employer," and it is unclear whether a joint employer analysis should apply to § 1981 claims in the same fashion. The parties, however, do not point to any difference, nor do they dispute that an employer can face liability under § 1981 for the actions of its employees. *Cf. Smith*, 681 F.3d at 896 n.2 ("One key difference between § 1981 and Title VII is that the latter authorizes suit only against the employer as an entity rather than against individual people who are agents of the employer."), *overruled on other grounds by Ortiz*, 834 F.3d at 760. And, in this case, the adverse employment action that Armour suffered is termination of her employment. Accordingly, it is necessary to determine who employed Armour, and it is proper to utilize Title VII's joint employer framework. *Baines*, 863 F.3d at 661.

15

(7th Cir. 2008). Whether an entity can be considered an employer depends upon "economic realities of the work situation." *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 361 (7th Cir. 2016). Specifically, a court weighs five factors: "(1) the extent of the employer's control and supervision over the putative employee; (2) the kind of occupation and nature of skill required, including whether skills were acquired on the job; (3) the employer's responsibility for the costs of operation; (4) the method and form of payment and benefits; and (5) the length of the job commitment." *Id.* Among these factors, "the employer's right to control is the 'most important' consideration." *Love v. JP Cullen & Sons, Inc.*, 779 F.3d 697, 702 (7th Cir. 2015) (quoting *Knight v. United Farm Bureau Mut. Ins. Co.*, 950 F.2d 377, 378–79 (7th Cir. 1991)). And, "when control is examined, 'the key powers are, naturally, those of hiring and firing.'" *Id.* at 703 (quoting *E.E.O.C. v. Illinois*, 69 F.3d 167, 171 (7th Cir. 1995)). Whether an employer-employee relationship exists is typically a question for the jury, and "a plaintiff can survive summary judgment even when not all factors support" a finding of such a relationship. *See id.* at 705.

Here, there are numerous facts from which a reasonable jury could conclude that at least some of the relevant factors weigh in favor of finding that Homer Tree Care and Homer Industries were Armour's joint employers.[19] First, and most importantly, a reasonable jury could conclude that they had control over and supervised her. Reposh, who served as president of Homer Tree Care and

---

[19] Of course, there are a number of facts that may indicate otherwise, *see* Defs.' Mem. (Armour) at 2–5, ECF No. 147; Defs.' Reply (Armour) at 3 n.1, but it is for the jury, and not this Court, to weigh competing facts and the inferences to be drawn from them.

managing member of Homer Industries, Defs.' LR 56.1(a)(3) Stmt. (Armour) ¶ 7, was Armour's supervisor, *see id.* ¶ 39. He both hired and fired her. *Id.* ¶¶ 24, 32, 69. Defendants note that Reposh gave Armour a substantial degree of discretion in her duties and exercised little day-to-day control over her. Defs.' Mem. (Armour) at 3; Defs' LR 56.1(a)(3) Stmt. (Armour) ¶ 39. But the relevant inquiry is whether an employer has the "right" to control and direct an employee's work, Defs.' Mem. (Armour) at 3 (quoting *Hojnacki v. Klein-Acosta*, 285 F.3d 544, 551 (7th Cir. 2002)), not whether the employer exercises that right. And, in any case, Reposh both hired and fired Armour—the key powers in assessing control.[20]

What is more, there is evidence that the nature of Armour's employment was such that she served as CEO of all of the companies, including Homer Tree Care and Homer Industries. Her employment contract stated that "[Homer Tree Service] *and its affiliate companies* are desirous of engaging the services of [a] CEO to operate, coordinate, and manage the office and financial affairs of [Homer Tree Service] *and its affiliate companies*." Pls.' LR 56.1(b)(3)(C) Stmt. ¶ 2 (emphasis added). While Homer Tree Service is named as the contracting party, the contract's plain language nevertheless envisions Armour serving all of the Homer Companies. To that end, Homer Tree Care and Homer Industries paid her directly through

---

[20]    Defendants would have the Court conclude that, when Reposh hired and fired Armour, he was acting only his capacity as president of the other Homer Companies. But this is by no means clear as a matter of law, especially in light of the other evidence from which a reasonable jury could conclude that Homer Tree Care and Homer Industries were Armour's joint employers. To that end, construing every reasonable inference in Armour's favor, Defendants' argument that Homer Tree Care and Homer Industries were not involved in the decision to fire her, Defs.' Mem. (Armour) at 6, is unpersuasive.

January 2015.  Defs.' LR 56.1(a)(3) Stmt. (Armour) ¶ 38.  Defendants make much of the fact that, starting in January 2015, Homer Management was created and began paying Armour's salary.  *Id.* ¶¶ 4, 35.  But Defendants describe Homer Management as having been created for the purpose of supporting and managing the other companies.  Defs.' LR 56.1(a)(3) Stmt. (Armour) ¶¶ 6, 55.  Thus, a reasonable jury could conclude that, notwithstanding the creation of Homer Management, Armour remained an employee at the service of the Homer Companies, including Homer Tree Care and Homer Industries.  Further evidence of this fact is that Armour continued to receive payments from Homer Tree Care and Homer Industries after her position moved under Homer Management.[21]  Pls.' LR 56.1(b)(3)(C) Stmt. ¶ 6.

In sum, there is evidence from which a reasonable jury could find that Homer Tree Care and Homer Industries exercised control over and supervised Plaintiff's employment, sought to employ her as their CEO, and either paid her or were responsible for reimbursing her for work-related expenses.  Based on these factors, a reasonable jury could conclude that Homer Tree Care and Homer Industries were her joint employers.  Defendants' motion for summary judgment on their behalf is therefore denied.

---

[21]    Defendants dispute whether these checks were reimbursements for work-related expenses.  Defs.' Resp. Pl.'s LR 56.1(b)(3)(C) Stmt ¶ 6.  But whether the checks were reimbursements or outright payments, a reasonable jury could nevertheless conclude that they are evidence that Homer Tree Care and Homer Industries paid Armour, which would support a finding that they employed her.

### 3.    Protected Activity

Next, Defendants make various challenges to Armour's *prima facie* case of retaliation under § 1981, beginning with the contention that she never engaged in protected activity.  To demonstrate that she engaged in protected activity, Armour must show that she "took some step in opposition to a form of discrimination that [§ 1981] prohibits."  *See O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 631 (7th Cir. 2011).  Her opposition must have been "based on a good-faith and reasonable belief that [she was] opposing unlawful conduct."  *Id.*

According to Armour, Reposh on various occasions stated that he did not want African-Americans working for the Homer Companies because of their race, and Armour "repeatedly advised" him that such a hiring practice was unlawful. Pls.' LR 56.1(b)(3)(C) Stmt. ¶¶ 10, 12.  Defendants contend that her complaints did not constitute protected activity because there is no evidence of any specific African-American applicant whose application was rejected.  Defs.' Mem. (Armour) at 7; Defs.' Reply (Armour) at 5.  Plaintiffs, however, testified otherwise, and the parties dispute whether the Homer Companies rejected qualified African-American applicants during Armour's employment.  *See* Pl. Armour's LR 56.1(b)(3)(B) Stmt. ¶¶ 45, 47.  Even putting aside this dispute, a reasonable jury could find that Armour had a reasonable, good-faith basis for believing such, given that, at least according to her, Reposh told her that he did not want African-Americans working at the Homer Companies because of their race, and, at the February 2015 meeting, specifically refused to consider African-American applicants.  Thus, a reasonable jury could conclude from this record that Armour engaged in protected activity.

### 4.     Causation and Pretext

Defendants further argue that, even if Armour's complaints to Reposh constituted protected activity, there is no evidence from which a reasonable jury could conclude that she was terminated because of those complaints.[22]   First, Defendants offer a number of authorities for the proposition that temporal proximity between protected activity and adverse employment is typically insufficient evidence by itself from which to draw an inference of causation.  Defs.' Mem. (Armour) at 10–11; Defs.' Reply (Armour) at 6.  They also observe that six months separate the last known instance of Armour's complaints (in February 2015) and her termination (in August 2015).  Defs.' Mem. (Armour) at 10–11; Defs.' Reply (Armour) at 6.  Both contentions, however, miss the mark.  First, while temporal proximity alone may be insufficient to infer causation, Armour offers more.  Specifically, according to Armour, Reposh threatened her with discharge on multiple occasions after she complained about his purported policy of refusing to employ African-Americans at the Homer Companies.  Pls.' LR 56.1(b)(3)(C) ¶ 13.  A reasonable jury could conclude that Reposh did exactly what he threatened to do. *See Bray*, 681 F.3d at 901 (observing that evidence of a direct threat of retaliation based on protected activity is sufficient to survive summary judgment).  In addition,

---

[22]     Armour at times suggests that she was subjected to disparate treatment beyond her termination.  Pls.' Resp. at 27 (discussing "Reposh's hostility and retaliation against [Plaintiffs]—including their firings").  But Armour has not described this treatment with sufficient specificity such that a reasonable jury could assess whether it would dissuade a reasonable employee from engaging in protected activity, as it must in order to constitute an adverse employment action. *See, e.g.*, *Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 889 (7th Cir 2016), *cert. denied*, 137 S. Ct. 82, 196 L. Ed. 2d 36 (2016).  Thus, the only adverse employment action on which she may proceed to trial is her termination.

the timeline between protected activity and termination is not as clear as Defendants make it out to be. The record reflects that Armour "repeatedly advised" Reposh that the Homer Companies' exclusion of African-American job applicants was unlawful. Pls.' LR 56.1(b)(3)(C) Stmt. ¶ 12. While she admits that she "cannot identify with particularity any date(s) she made these alleged concerns known," Pl. Armour's LR 56.1(b)(3)(B) Stmt. ¶ 52, the record does not establish that February 2015 was the last instance.

In addition, the events immediately leading up to Armour's termination provide further evidence from which a reasonable jury could conclude that her protected activity caused her termination. On August 17, 2015, Hocking hired Moore, the only African-American offered employment at the Homer Companies during Armour's employment that Defendants have identified by name. Defs.' LR 56.1(a)(3) Stmt. (Armour) ¶ 43; Defs.' Resp. Pls.' LR 56.1(b)(3)(C) Stmt. ¶ 18; Defs.' LR 56.1(a)(3) Stmts. J.A., Ex. BB, at 11. One day later, on August 18, 2015, Reposh instructed Armour to fire Castro. Pls.' LR 56.1(b)(3)(C) Stmt. ¶ 47. And three days later, on August 21, 2015, Reposh fired Armour. *Id.* ¶ 77. If, as Armour claims, Reposh had instituted a company-wide policy of not hiring African-Americans and threatened Armour and Castro with termination when they complained about it, a reasonable jury could conclude that he would have been displeased about Moore's hiring and manifest this displeasure through firing Armour. Moreover, a jury might make much of the fact that, a day after Moore's hiring, Reposh instructed Armour to hire Castro, having threatened both of them with termination based on the same protected activity. And, mere days later, Reposh fired Armour. Drawing

21

all reasonable inferences in Plaintiffs' favor, a reasonable jury might conclude that Reposh elected to terminate Plaintiffs within days of each other because they had opposed his allegedly discriminatory hiring practices together. In sum, this sequence of events could lead a reasonable jury to infer that Reposh acted with a retaliatory motive. Granted, as Defendants point out, Armour did not hire Moore, and there is no evidence that Reposh took retaliatory action against Hocking, who hired him. Defs.' Reply (Armour) at 10–11 & nn. 9–10. But while these facts may certainly weaken an inference of retaliatory motive, they do not eliminate it.

Defendants, of course, maintain that Reposh had various legitimate business reasons for terminating Armour. Defs.' Mem. (Armour) at 13–14; Defs.' Reply (Armour) at 6–10. Specifically, Defendants claim that her termination resulted from various breaches of her employment agreement and a decrease in employee morale during her time as CEO. Defs.' LR 56.1(a)(3) Stmt. (Armour) ¶¶ 71–72. But, while Armour admits that there were some issues with company morale and that employees had complained to Reposh about her management, Pl. Armour's LR 56.1(b)(3)(B) Stmt. ¶¶ 64, 66, she testified at her deposition that the other stated bases for her termination did not occur, or were actions Reposh authorized or acknowledged without discipline, *id.* ¶¶ 71–72.[23] Her testimony therefore calls into

---

[23]     Armour admits that she altered one of Reposh's emails, and that she ordered a background check on a non-employee and surveillance on certain employees. Pl. Armour's LR 56.1(b)(3)(B) Stmt. ¶¶ 82, 84; *see* Armour Dep. (8/26/16) at 216:4–15, 225:16–22. But, even so, a reasonable jury could nevertheless conclude that she was terminated because of the protected activity in which she engaged, in light of the evidence she has put forth of suspicious timing and Reposh's animus, as well as her refutation of the other stated grounds for her termination. Put another way, a reasonable jury could conclude that Defendants would not have terminated her on the basis of the admitted conduct standing

doubt whether the stated reasons for her termination were sincerely held, and a reasonable jury could conclude that these reasons were pretextual. *Gordon v. United Airlines, Inc.*, 246 F.3d 878, 889 (7th Cir. 2001) ("[W]hen an employee provides '[a] detailed refutation of events which underlie the employer's negative performance assessment,' the employee demonstrates 'that the employer may not have honestly relied on the identified deficiencies in making its decision.'" (alteration in original) (quoting *Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1460–61 (7th Cir. 1994))). In addition, Armour points out that, on July 16, 2015—*i.e.*, just over one month before her termination—Reposh threw a party to commemorate her one-year work anniversary with the Homer Companies, which Armour claims was intended to recognize her excellent performance. Defs.' LR 56.1(a)(3) Stmt. (Armour) ¶ 67.[24] Given the proximity of this party to her termination and the fact that several of the purported grounds for her termination preceded the party, a reasonable jury could conclude that the stated grounds were not the true reasons for her termination. *Culver v. Gorman & Co.*, 416 F.3d 540, 546–47 (7th Cir. 2005) (holding that a supervisor's "sudden dissatisfaction" with plaintiff's performance casted doubt on the stated reasons for plaintiff's termination).

Ultimately, a jury must decide what in fact occurred and why Reposh fired Armour. At this stage, however, construing every reasonable inference in her favor,

---

alone, if the other purported grounds had not occurred. *See Russell v. Acme-Evans Co.*, 51 F.3d 64, 69 (7th Cir. 1995) (explaining that a plaintiff can survive summary judgment where an employer has not shown that it would have terminated plaintiff for a non-pretextual reason standing independently from other pretextual rationales).

[24] Again, the parties dispute whether this was the purpose of the party, Pl. Armour's LR 56.1(b)(3)(B) Stmt. ¶ 67, but this is for the jury to decide.

a reasonable jury could conclude that she was fired because of her complaints to Reposh about his racially discriminatory hiring practices.

### 5.    The Manager Rule

Defendants also maintain that, even if a reasonable jury could conclude that Armour has proven the elements of a § 1981 retaliation claim, her claim should nevertheless be foreclosed by the so-called "manager rule."   Under this rule, "a management employee that, in the course of her normal job performance, disagrees with or opposes the actions of an employer does not engage in protected activity" for purposes of a Title VII retaliation claim.  *Brush v. Sears Holdings Corp.*, 466 F. App'x 781, 787 (11th Cir. 2012) (internal quotation marks omitted).   While acknowledging that the Seventh Circuit has not adopted, let alone addressed, the viability of the manager rule, Defendants nevertheless urge the Court to apply it in this case.  Defs.' Mem. (Armour) at 9–10; Defs.' Reply (Armour) at 4–5.

The manager rule originated from certain circuits' interpretation of the anti-retaliation provision of the Fair Labor Standards Act (FLSA), which proscribes "discharg[ing] or in any other manner discriminat[ing] against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to testify in any such proceeding, or has served or is about to serve on an industry committee."  29 U.S.C. § 215(a)(3).  In interpreting this language, several circuits have arrived at the conclusion that the FLSA's anti-retaliation provision does not reach "activities which are neither adverse to the company nor supportive of adverse rights under the statute which are asserted against the company."

24

*McKenzie v. Renberg's Inc.*, 94 F.3d 1478, 1486–87 (10th Cir. 1996); *accord Hagan v. Echostar Satellite, L.L.C.*, 529 F.3d 617, 627–30 (5th Cir. 2008); *Claudio-Gotay v. Becton Dickinson Caribe, Ltd.*, 375 F.3d 99, 102–03 (1st Cir. 2004). Thus, under the manager rule in these circuits, an employee must "cross[ ] the line from being an employee merely performing her job . . . to an employee lodging a personal complaint about [ ] wage and hour practices of her employer and assert[ ] a right adverse to the company" in order to prevail on an FLSA retaliation claim. *McKenzie*, 94 F.3d at 1486 (emphasis omitted). In support of the rule, the Fifth Circuit has explained that, without it, "nearly every activity in the normal course of a manager's job would potentially be protected activity under [§] 215(a)(3)" and "[a]n otherwise typical at-will employment relationship could quickly degrade into a litigation minefield, with whole groups of employees . . . being difficult to discharge without fear of a lawsuit." *Hagan*, 529 F.3d at 628.

Two circuits have signaled support for the manager rule in the Title VII context, as well. *Weeks v. Kansas*, 503 F. App'x 640, 642–43 (10th Cir. 2012); *Brush*, 466 F. App'x at 787. Three other circuits, however, as well as the only lower court in this circuit to have considered the issue, have declined to extend the rule. *DeMasters v. Carilion Clinic*, 796 F.3d 409, 424 (4th Cir. 2015); *Littlejohn v. City of New York*, 795 F.3d 297, 318 (2d Cir. 2015); *Chapman v. Milwaukee Cty.*, 151 F. Supp. 3d 892, 900 (E.D. Wis. 2015); *see Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 579 (6th Cir. 2000) ("[T]he fact that Plaintiff may have had a contractual duty to voice [discrimination] concerns is of no consequence to his claim."). These courts have provided persuasive reasons for declining to apply the manager rule in the

Title VII context, and the Court concludes that these reasons apply with equal force to a § 1981 retaliation claim.

First, while the FLSA narrowly defines the formal conduct that it protects, protected activity under Title VII (and, by extension, § 1981) is not so constrained. *DeMasters*, 796 F.3d at 422. Under the FLSA, protected activity is limited to those instances where an individual has "filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to testify in any such proceeding, or has served or is about to serve on an industry committee." 29 U.S.C. § 215(a)(3). By contrast, Title VII protects "any . . . employees" who "oppos[e] any practice" made unlawful under the statute, "*or* [who have] made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under the statute. 42 U.S.C. § 2000e-3 (emphasis added). The Supreme Court has therefore interpreted Title VII to provide "broad protection from retaliation." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006). Thus, whereas the FLSA protects only a narrow set of formal actions that an employee would seem to take only outside of his or her prescribed duties, Title VII contains no such limits, explicitly protecting any action of opposition, and specifically distinguishing the more formal actions listed in the FLSA's anti-retaliation provision. Here, of course, Armour's complaint arises under § 1981. But, as noted above, claims under Title VII and § 1981 are treated under the same framework, *Baines*, 863 F.3d at 661, and Defendants have offered no argument for why § 1981 claims should be treated differently.

Because there is no basis for the manager rule in Title VII's text, its proponents have resorted to a policy concern: namely, that permitting human resources personnel or other such employees to file retaliation claims might open employers to suit any time they terminate such an employee. *See Hagan*, 529 F.3d at 628. But the manager rule solves this problem by creating an arguably larger one. As the Fourth Circuit has aptly explained: "under [the manager rule], the categories of employees best able to assist employees with discrimination claims—the personnel that make up [employee assistance programs], [human resources], and legal departments—would receive no protection from Title VII if they oppose discrimination targeted at the employees they are duty-bound to protect." *DeMasters*, 796 F.3d at 423. In any case, surely the exceedingly broad language in Title VII that protects "any" employees who oppose "any practice" made unlawful by the statute evinces Congress's intent to favor broad protections at the risk of increased litigation, and it, rather than the judiciary, is better suited to revisit this policy calculus if necessary. *See Chapman*, 151 F. Supp. 3d at 900.

If this were not enough, the manager rule, at least as posited in the FLSA context, would be inordinately difficult to apply in practice in cases involving claims under Title VII and § 1981, which protect a much wider array of employee conduct. Under the Tenth Circuit's articulation of the rule, a court must discern when an employee has "crossed the line from being an employee merely performing her job . . . to an employee lodging a personal complaint." *McKenzie*, 94 F.3d at 1486. It is not hard to imagine instances in which this line will be difficult to draw. This case is no exception. If a CEO of a company goes to the company president and says, "I

27

have serious reservations about our discriminatory hiring practices," as Armour claims to have done here, *see* Pls.' LR 56.1(b)(3)(C) Stmt. ¶ 12, is the CEO merely performing her job, or lodging a personal complaint? Courts would struggle to answer such a question, and whatever the merits of the manager rule in the FLSA context, the importation of such a rule whole-cloth to Title VII and § 1981 retaliation claims would raise significant adjudicatory concerns.

For all of these reasons, the Court declines to apply the manager rule to Armour's retaliation claim.

### 6.    After-Acquired Evidence Defense

As their last stand against Armour's retaliation claim, Defendants argue that, assuming she can prove liability *arguendo*, her damages should nevertheless be substantially reduced under the after-acquired evidence doctrine. Under the after-acquired evidence doctrine, "[a]n employer may be found liable for employment discrimination, but if the employer later—typically in discovery—turns up evidence of employee wrongdoing which would have led to the employee's discharge, then the employee's right to back pay is limited to the period before the discovery of this after-acquired evidence." *Sheehan v. Donlen Corp.*, 173 F.3d 1039, 1047 (7th Cir. 1999) (citing *McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352, 361–62 (1995)). To make out an after-acquired evidence defense, the defendant must show, "by a preponderance of the evidence[,] that the after-acquired evidence would have led to [plaintiff's] termination." *Id.* at 1047–48.

Here, Defendants maintain that Armour misrepresented that she had obtained a bachelor's degree in her employment application, a fact they did not

learn until discovery, and which would have resulted in her immediate termination. Defs.' Mem. (Armour) at 14; Defs.' Reply (Armour) at 12 n.11. But a genuine dispute of material fact precludes a ruling in favor of Defendants' after-acquired evidence at this stage. Armour testified that she informed Reposh that she did not have a bachelor's degree prior to her hiring, and claims that he told her to apply anyway and indicate that she did have a degree on her resume. *See* Pl. Armour's LR 56.1(b)(3)(B) Stmt. ¶¶ 90, 92; Armour Dep. (8/26/16) at 127:8–23. Thus, according to Armour, this evidence was not newly discovered, but was known to Reposh at the inception of her employment. This dispute of fact precludes a finding that Defendants are entitled to a reduction in possible damages as a matter of law. Defendants' motion for summary judgment on this basis is therefore denied.

## B. Section 20 of the IWA

Defendants also move for summary judgment on Count II of Plaintiffs' amended complaint, in which Armour alleges a number of violations of § 20 of the IWA. Under § 20 of the IWA, "[a]n employer may not retaliate against an employee for refusing to participate in an activity that would result in a violation of a State or federal law, rule, or regulation." 740 Ill. Comp. Stat. 174/20. A claim under § 20 comprises two elements: (1) that plaintiff "refused to participate in an activity that would result in a violation of a state or federal law, rule, or regulation," and (2) that plaintiff's employer "retaliated against [plaintiff] because of that refusal." *Sardiga v. N. Tr. Co.*, 948 N.E.2d 652, 657 (Ill. App. Ct. 2011). Importantly, to prevail on a § 20 claim, "the plaintiff must actually refuse to participate . . . 'refusing' means refusing; it does not mean 'complaining' or 'questioning.'" *Id.*; *see also Robinson v.*

29

*Alter Barge Line, Inc.*, 513 F.3d 668, 670 (7th Cir. 2008) (affirming grant of summary judgment against IWA § 20 plaintiff where there was "no evidence that the plaintiff refused to engage in" unlawful activity). It is the Plaintiff's burden to demonstrate a refusal and that the activity at issue would have violated a law, rule, or regulation. *Corah v. Bruss Co.*, 77 N.E.3d 1038, 1043 (Ill. App. Ct. 2017) ("Plaintiff bears the burden of establishing [her] claim under the [IWA].").[25]

In Count II of Plaintiffs' amended complaint, Armour alleges that she refused to participate in Reposh's policy of refusing to hire African-Americans, which she claims would violate § 1981, Title VII, and the IHRA. Am. Compl., Count II, ¶ 3, ECF No. 41. In addition, she asserts that she "refused to follow or participate in other directives by Reposh . . . including, but not limited to"

> a. In July and August of 2015, directing that injured workers who invoked their rights under the Illinois Worker's [*sic*] Compensation Act be disciplined, retaliated against and/or fired;
>
> b. In August of 2015, directing that employees who complain, or otherwise invoke their rights to work in a safe and/or properly ventilated workplace, as required by OSHA (or applicable Illinois worker or occupational safety/hazard law), be disciplined, retaliated against and/or fired;
>
> c. Directing that certain construction and related activities commence without first obtaining legally required permits or licenses—including to effect the approval and installation of above-ground fuel tanks located adjacent to the Homer Companies' corporate office, in Lockport, Illinois, in or about July of 2015;

---

[25] Thus, an IWA § 20 claim differs from a § 1981 retaliation claim in two important respects. First, a plaintiff must establish actual refusal to participate in a violation of the law, rather than mere opposition to it. And second, a plaintiff must demonstrate that a violation of the law "would result" absent refusal, rather than simply a reasonable, good-faith belief in the existence of unlawful conduct.

d. Directing her to ignore, misclassify, refuse to pay overtime, or otherwise violate the federal Fair Labor Standards Act . . . and/or Illinois labor laws, at one or more of the Homer Companies; and

e. Other directives by Reposh and/or the Homer Companies that Armour reasonably believed would violate other federal and/or Illinois laws, rules, or regulations, including tax laws, rules, and regulations.

*Id.*, Count II, ¶ 4. Defendants contend that Armour cannot make out an IWA § 20 claim with respect to any of these purported directives. The Court will address each in turn.

### 1. Racially Discriminatory Hiring

Defendants first argue that Armour cannot maintain her IWA § 20 claim on the basis of refusing to participate in Reposh's practice of refusing to hire African-Americans. They contend, in pertinent part, that "[Armour] could only have 'refused to participate' by engaging in the conduct she was supposedly prohibited from doing," but that there is no evidence that she hired or even interviewed any African-American job applicants. Defs.' Mem. (Armour) at 17; Defs.' Reply (Armour) at 13–14. Armour, for her part, maintains that she told Reposh that she "could not follow his illegal directives," Pls.' LR 56.1(b)(3)(C) Stmt. ¶ 12, but concedes that she never interviewed an African-American job applicant during her employment, Pl. Armour's LR 56.1(b)(3)(B) Stmt. ¶ 47. She further concedes that Castro is the only applicant for any position she ever interviewed. *Id.* The record, therefore, at most demonstrates that Armour complained to Reposh about his practice and told him that she could not follow it, not that she actually refused to participate in it by

interviewing, hiring, or otherwise considering an African-American applicant.[26] Thus, she cannot sustain an IWA § 20 claim on this basis. *Sardiga*, 948 N.E.2d at 657; *see Pignato v. Givaudan Flavors Corp.*, No. 11 C 7090, 2013 WL 995157, at *5 (N.D. Ill. Mar. 13, 2013) (granting summary judgment on IWA § 20 claim where "plaintiff did not actually abstain from any course of conduct or voice a refusal to do any task"). Defendants' motion for summary judgment with respect to this aspect of Armour's IWA § 20 claim is granted.

## 2. Retaliation Under Illinois Workers' Compensation Act

Second, Defendants contend that Armour cannot sustain her IWA § 20 claim with respect to refusing to retaliate against employees who invoked their rights under the Illinois Workers' Compensation Act (IWCA).[27]  In their view, there is no evidence in the record that Armour refused to engage in conduct that would violate the IWCA. Defs.' Mem. (Armour) at 18; Defs.' Reply (Armour) at 15. The IWCA provides, in pertinent part:

> It shall be unlawful for any employer, insurance company or service or adjustment company to interfere with, restrain or coerce an employee

---

[26] The closest she comes is by way of her description of the February 2015 meeting, at which Castro told Reposh that the Homer Companies "ha[d] to consider" qualified African-American applicants. Pls.' LR 56.1(b)(3)(C) Stmt. ¶ 14; *see* Castro Dep. at 49:9–53:24. But even accepting Plaintiffs' version of what occurred at this meeting, Armour cannot make out an IWA § 20 claim with respect to this meeting, because there is no evidence that she interviewed or otherwise considered any of these applicants.

[27] In her summary judgment briefing and statement of facts, Armour advances a new claim that she refused to participate in insurance fraud. Pls.' Resp. at 13; Pls.' LR 56.1(b)(3)(C) Stmt. ¶¶ 39–42. Armour failed to include this claim in her amended complaint, however, and she therefore may not pursue it on summary judgment. *Anderson v. Donahoe*, 699 F.3d 989, 997 (7th Cir. 2012) ("[A] plaintiff 'may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment.'") (quoting *Grayson v. O'Neill*, 308 F.3d 808, 817 (7th Cir. 2002)).

> in any manner whatsoever in the exercise of the rights or remedies granted to him or her by this Act or to discriminate, attempt to discriminate, or threaten to discriminate against an employee in any way because of his or her exercise of the rights or remedies granted to him or her by this Act.

820 Ill. Comp. Stat. 305/4(h).[28]   According to Armour, Reposh instructed her to engage in precisely this conduct, and she refused.  Pls.' LR 56.1(b)(3)(C) Stmt. ¶¶ 43, 45.  Defendants, of course, dispute whether this interaction occurred, Defs.' Resp. Pls.' LR 56.1(b)(3)(C) Stmt. ¶¶ 43, 45, but whether it did is for a jury to decide.[29]

In their opening brief, Defendants further maintain that there is no evidence that her refusal caused her termination.  Defs.' Mem. (Armour) at 20.[30]   But, according to Armour, she voiced her refusal in the month before she was fired, and informed Reposh at a meeting only days before she and Castro were terminated that they had contacted counsel and believed his directive to be unlawful.  Pls.' LR 56.1(b)(3)(C) Stmt. ¶ 46.  Reposh purportedly reacted angrily.  *Id.*  If a jury chooses to believe that these events occurred, it could reasonably infer retaliation.  *See*

---

[28]    Thus, contrary to Defendants' representations, Defs.' Mem. (Armour) at 18 n.17, the IWCA bars more than retaliatory termination.

[29]    Significantly, Defendants do not argue that Armour did not have the power to carry out Reposh's instructions, or that there were not employees who invoked their rights under the statute that Armour could have terminated.  Moreover, the fact that Armour did not object to Reposh's instruction in a certain email may weaken Armour's case, Defs.' Reply (Armour) at 15, but a reasonable jury could nevertheless choose to believe that she orally refused to participate in violating the IWCA.

[30]    Defendants do not mention this argument in their reply brief, despite Armour's argument to the contrary.  Their failure to do so may indicate they no longer wish to pursue it, particularly given their reply brief spans twenty-two pages and includes twenty-one footnotes, which extend to as many as twenty-one lines.  Even if Defendants had not forfeited the argument, however, it would fail.

*Greengrass v. Int'l Monetary Sys. Ltd.*, 776 F.3d 481, 486 (7th Cir. 2015) (holding that evidence of suspicious timing and animus were sufficient for plaintiff to survive summary judgment in a retaliation case). And, for the reasons explained *supra*, a reasonable jury might discredit Reposh's purported bases for firing Armour. Accordingly, as to this portion of Armour's IWA § 20 claim, Defendants' motion for summary judgment is denied.

### 3. Retaliation Under OSHA

Third, Defendants assert that Armour cannot proceed with her IWA § 20 claim as it relates to refusing to retaliate against employees who invoked their rights under OSHA.[31] Once again, they argue that there is no evidence in the record that Armour refused to engage in conduct that would violate OSHA. Defs.' Reply (Armour) at 16. Armour, however, claims that on August 17, 2015, Reposh instructed her to fire a Homer employee, Matt Lovas, who complained to her about a potential OSHA violation relating to ventilation at a shop affiliated with the Homer Companies. Pls.' LR 56.1(b)(3)(C) Stmt. ¶¶ 60–61. She refused. *Id.* No OSHA violations or citations were ever issued in connection with the ventilation issue, Defs.' LR 56.1(a)(3) Stmt. (Armour) ¶ 98, but a mock inspection prior to

---

[31] In her complaint, Armour also references "applicable Illinois worker or occupational safety/hazard law." Am. Compl., Count II, ¶ 4(b). Armour fails, however, to identify what particular law she seeks to refer to, and thus has not created a triable issue as to whether the law would have been violated. It is her burden to do so. *Corah*, 77 N.E.3d at 1043. The Court therefore declines to consider her IWA § 20 claim with relation to such a law. *See Reed v. Colo. Tech. Univ.*, No. 15 C 3368, 2016 WL 1019830, at *4 (N.D. Ill. Mar. 15, 2016) (dismissing IWA § 20 claim where plaintiff did not identify the law that would have been violated); *see also Ulm v. Mem'l Med. Ctr.*, 964 N.E.2d 632, 641 (Ill. App. Ct. 2012).

Lovas's complaint "found that additional exposure testing would be required to determine the efficacy of the current ventilation system in the shop," *id.* ¶ 99.

> OSHA specifically proscribes
>
> discharg[ing] or in any manner discriminat[ing] against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter or has testified or is about to testify in any such proceeding or because of the exercise by such employee on behalf of himself or others of any right afforded by this chapter.

29 U.S.C. § 660(c)(1). Accompanying regulations clarify that complaints include those made directly to employers "if made in good faith." 29 C.F.R. § 1977.9(c). Thus, if a jury elects to credit Armour's testimony about Lovas's complaint and Reposh's instruction, it could reasonably conclude that she refused to participate in conduct that would violate OSHA. Defendants dispute whether Lovas ever even made the complaint at issue. Resp. Pls.' LR 56.1(b)(3)(C) Stmt. ¶ 60. It is for a jury, however, to decide whose version to believe. Defendants also point out that the shop at issue is not a defendant in this action, and that no OSHA violations or citations were issued. Defs.' Reply (Armour) at 15–16; Defs.' Resp. Pls.' LR 56.1(b)(3)(C) Stmt. ¶¶ 60–61. But it is irrelevant that the shop is not a defendant, because Reposh—in his capacity as president of the Homer Companies—gave the directive at issue. It would be another matter if Armour did not have the power to carry out the directive, but Defendants do not argue that she did not. And, because OSHA protects good-faith complaints, it is also irrelevant that no OSHA violations or citations resulted. To that end, Defendants' assertion that an inspection revealed

that further testing would be needed on the ventilation system at issue suggests a good-faith basis for Lovas's complaint indeed existed.

This leaves the matter of whether a reasonable jury could conclude that Reposh terminated Armour because she refused to fire Lovas. As noted previously, evidence of suspicious timing alone is rarely enough to survive summary judgment. *E.g.*, *Sklyarsky v. Means-Knaus Partners, L.P.*, 777 F.3d 892, 898 (7th Cir. 2015). Here, however, a reasonable jury could infer causation because Reposh terminated Armour so closely on the heels of her refusal to terminate Lovas four days earlier. *See, e.g.*, *Casna v. City of Loves Park*, 574 F.3d 420, 427 (7th Cir. 2009). For these reasons, Defendants' motion for summary judgment on this aspect of Armour's IWA § 20 claim is denied.

### 4.     Violations of Other Laws, Rules, and Regulations

Finally, Defendants argue that Armour cannot move forward with the portion of her IWA § 20 claim based on refusing to participate in sundry violations of the FLSA "and/or Illinois labor laws," rules requiring certain construction permits or licenses, and "other federal and/or Illinois laws, rules[,] or regulations, including tax laws, rules[,] and regulations." Here as well, they argue that there is insufficient evidence in the record that Armour refused to engage in conduct that would violate the FLSA. Defs.' Mem. (Armour) at 16.

Beginning with the FLSA, even assuming that there is admissible evidence in the record that Armour refused to participate in conduct she believes violated the statute, Pls.' LR 56.1(b)(3)(B) Stmt. ¶¶ 48, 54; Pl. Armour's LR 56.1(b)(3)(B) Stmt. ¶¶ 101, 105, 107, Armour nevertheless fails to provide any analysis as to why any of

these directives would violate the FLSA (or some other unspecified Illinois labor law). The FLSA is a complex statute, and its application depends upon various circumstances. But Armour has not cited a single provision of the FLSA, let alone explained why such a provision would bar the various activities at issue. As just one example, while the FLSA details various exemptions from its overtime pay requirements, 29 U.S.C. § 213(a), Armour has provided no evidence from which the Court can discern whether Reposh instructed Armour to deem certain employees exempt who should not be. The same analysis is lacking for each of Reposh's purported directives. It is Armour's burden to create a triable issue of fact that the FLSA would have been violated if she had done as Reposh requested, *see Corah*, 77 N.E.3d at 1043, and she has not satisfied her burden, *see Reed*, 2016 WL 1019830, at *4; *see also Ulm*, 964 N.E.2d at 641.

The same is true with respect to her claim predicated on refusing to participate in conducting "certain construction and related activities . . . without first obtaining legally required permits or licenses," specifically with regard to the installation of certain above-ground fuel tanks. *See* Am. Compl., Count II, ¶ 4(c). Armour again fails to cite any particular law, rule, or regulation that she claims would have been violated, nor has she provided any explanation as to how such a law, rule, or regulation would have been violated. For the same reason, insofar as Armour's claim is based on refusing to participate in "[o]ther directives by Reposh that . . . would violate other federal and/or Illinois laws, rules[,] or regulations, including tax laws, rules[,] and regulations," *see id.*, Count II, ¶ 4(e), Armour cannot discharge her burden of proving that a law, rule, or regulation would have been

violated simply by testifying such a violation occurred. This is especially so when the Court has no way of determining what laws, rules, or regulations Armour means to refer to in the first place.

No reasonable jury, therefore, could rule in her favor on these aspects of her IWA § 20 claim. Defendants' motion for summary judgment in this respect is granted.

## C. Breach of Contract

Defendant Homer Tree Service also seeks summary judgment on Count III of Plaintiffs' amended complaint, Armour's breach of contract claim. Armour's employment contract with Homer Tree Service stated, in pertinent part, that "[t]his Agreement may be terminated by either party before the end of the term with or without cause, by giving thirty (30) days written notice. If [Homer Tree Service] terminates [Armour] without cause, it shall pay [her] the equivalent of four (4) months of her current salary." Defs.' LR 56.1(a)(3) Stmt. (Armour) ¶ 14; Armour Dep. (8/26/16), Ex. 4, at 4–5. Armour alleges that Homer Tree Service breached her employment contract in two ways: first, by failing to give her thirty days' notice of her termination, and second, by failing to pay her four months of her current salary despite terminating her without cause. Pls.' Resp. at 41; Am. Compl., Count III, ¶¶ 4–6. With regard to the first ground for breach, Homer Tree Service argues that Plaintiff has not adduced evidence of damages. Defs.' Reply (Armour) at 18 n.19. This argument, however, is plainly mistaken: Armour offers evidence that Homer Tree Service "failed . . . [to] pay Armour her contractually mandated termination pay in lieu of 30 days['] notice," and that she suffered damages that include "lost

income." Pls.' Resp. at 41; *see* Defs.' LR 56.1(a)(3) Stmts. J.A., Ex. MM, at 7. Homer Tree Service has presented no reason that Armour cannot recover the income she would have received during the period of thirty days' notice.

As for the second ground, a genuine issue of fact remains as to whether Armour was terminated "for cause." For the reasons explained above, a reasonable jury could conclude that Armour was terminated because of her complaints about Reposh's purported discriminatory hiring practices. In such a case, her termination would be without cause. Alternatively, a reasonable jury could conclude that she was terminated based on some or all of the grounds that Reposh and the Homer Companies have asserted. Because a factual dispute remains as to whether cause for her termination existed, summary judgment is inappropriate. *Rosenberger v. United Cmty. Bancshares, Inc.*, 73 N.E.3d 642, 653 (Ill. App. Ct. 2017) (citing *Mitchell v. Jewel Food Stores*, 568 N.E.2d 827, 832 (1990)) (explaining that "whether an employee engaged in misconduct [justifying termination] is a question for the trier of fact to resolve"). Homer Tree Service's motion for summary judgment on Armour's breach of contract claim is therefore denied.[32]

---

[32] Defendants also move for summary judgment on their affirmative defenses to Armour's breach of contract claim. Defs.' Mem. (Armour) at 26 n.25. There is a genuine dispute of fact, however, as to the principal contention underlying their defenses: namely, Defendants' contention that Armour misrepresented she had a bachelor's degree on her resume without Reposh's knowledge. As noted above, Armour testified that Reposh knew that she did not have a bachelor's degree at the time of her hiring and instructed her to submit her resume claiming that she did anyway. *See* Pl. Armour's LR 56.1(b)(3)(B) Stmt. ¶¶ 90, 92; Armour Dep. (8/26/16) at 127:8–23.

### D. Assault and Battery Against the Homer Companies

Next, the Defendants move for summary judgment on Armour's assault and battery claims as against the Homer Companies, Count V of Plaintiffs' Amended Complaint. The Court permitted these claims to proceed at the motion to dismiss stage, holding that the claims were not preempted by the Illinois Human Rights Act (IHRA), and that insofar as Armour sought to hold the Homer Companies liable for Reposh's conduct on the basis of an alter ego theory, her pleadings were sufficient. *Armour v. Homer Tree Servs., Inc.*, No. 15 C 10305, 2016 WL 3014819, at *3 (N.D. Ill. May 26, 2016). Defendants now renew their effort to dismiss the claims, focusing on the IWCA. They argue that discovery has produced no evidence that would support liability under an alter ego theory.

The IWCA "bar[s] an employee from bringing a common law cause of action against his or her employer unless the employee-plaintiff proves: (1) that the injury was not accidental; (2) that the injury did not arise from his or her employment; (3) that the injury was not received during the course of employment; or (4) that the injury was not compensable under the Act." *Meerbrey v. Marshall Field & Co.*, 564 N.E.2d 1222, 1226 (Ill. 1990) (citing 820 Ill. Comp. Stat. 305/5, 305/11). The word "accidental" is not interpreted technically and includes intentional torts. *Id.* Thus, "injuries inflicted intentionally upon an employee by a co-employee are 'accidental' within the meaning of the [IWCA], since such injuries are unexpected and unforeseeable from the injured employee's point of view." *Id.* Nevertheless, as the Court noted in its order on Defendants' motion to dismiss, the IWCA "does not bar intentional torts against the employer 'for injuries which the employer or its alter

40

ego intentionally inflicts upon an employee.'" *Armour*, 2016 WL 3014819, at *3 (quoting *Meerbrey*, 564 N.E.2d at 1226).

To hold that an individual is an alter ego of a corporation—also referred to as piercing the corporate veil—the party asserting liability must demonstrate that there is "such unity of interest and ownership that the separate personalities of the corporation and the individual [or other corporation] no longer exist; and . . . that adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice." *Van Dorn Co. v. Future Chem. & Oil Corp.*, 753 F.2d 565, 569–70 (7th Cir. 1985) (citations omitted) (applying Illinois law). Courts typically consider whether some or all of the following circumstances are present: "(1) the failure to maintain adequate corporate records or to comply with corporate formalities, (2) the commingling of funds or assets, (3) undercapitalization, and (4) one corporation treating the assets of another corporation as its own." *Id.* at 570 (citations omitted) (applying Illinois law).

Here, Armour points to no evidence that Reposh and the Homer Companies have such unity of interest that they should not be treated as separate entities, or that treating them as distinct legal entities would sanction a fraud or promote injustice. In her response brief, she summarily states that "at best, it will be for the jury to decide if [the Homer Companies] are liable for Reposh's misconduct as his alter ego." Pls.' Resp. at 40 (internal quotation marks omitted). But Armour provides no grounds on which a reasonable jury could make such a determination. In response to one of Defendants' statements of facts, Armour asserts that "Reposh owns and controls the Homer Companies, and as such is their alter ego." Pl.

41

Armour's LR 56.1(b)(3)(B) Stmt. ¶ 131 (internal quotation marks omitted); *see id.* ¶ 73. But mere ownership and control of a corporation, without more, is insufficient for alter ego liability.

Because there is no evidence that would support Armour's alter ego theory, and she offers no other argument in support of her claims, the Court finds that her assault and battery claims against the Homer Companies are preempted by the IWCA. Accordingly, Defendants' motion for summary judgment as to Armour's claims of assault and battery against the Homer Companies is granted.

### E. Armour's Counterclaims

In addition to seeking summary judgment on Armour's claims, Defendants also move for summary judgment on three of Homer Tree Service's and Homer Management's counterclaims: breach of fiduciary duty (Count II of both parties' counterclaims), unjust enrichment (Count V of Homer Tree Service's counterclaims, Count III of Homer Management's), and conversion (Count VI of Homer Tree Service's counterclaims, Count IV of Homer Management's).

Beginning with the breach of fiduciary duty claims, Defendants contend that Armour:

- Misappropriated confidential and proprietary information for non-business use without authorization;

- Hired Castro knowing she did not have any prior experience working in human resources, despite Castro's representations;

- Used the good will of the company to obtain unauthorized background checks from a third party vendor on non-employees and employees;

42

- Accepted a sum of approximately $14,527 in tuition reimbursement from the company to complete her bachelor's degree, for which the company did not agree to pay;

- Accessed Reposh's company email account without authorization and manipulated an email sent to him;

- Purchased a fuel management system in the amount of approximately $15,000 without prior authorization, for which the company paid a $5,186.80 restocking fee;

- Directed Terzian to increase Plaintiff's PTO bank by an additional three weeks, knowing her employment would be terminated shortly thereafter.

Defs.' Mem. (Armour) at 27. A genuine dispute of material fact, however, exists as to most of these purported breaches. Pl. Armour's LR 56.1(b)(3)(B) Stmt. ¶ 18 (disputing whether Castro had prior experience in human resources); *id.* ¶ 72 (claiming authorization to purchase the fuel management system)[33]; *id.* (denying that Armour requested that Terzian increase Plaintiff's PTO bank)[34]; *id.* (testifying

---

[33]  In their reply brief, Defendants claim that "[Armour] testified that she received Reposh's permission for the purchase on May 8, 2015, however, the record evidence shows that Plaintiff had previously committed the company to the project on January 13, 2015." Defs.' Reply (Armour) at 20 (citing Defs.' LR 56.1(a)(3) Stmt. (Armour) ¶ 72). Not only do Defendants fail to indicate where the record shows that Armour made this commitment, but even if she secured authorization after committing the company to the purchase, Defendants fail to explain how belated authorization would not comply with her fiduciary duties.

[34]  Defendants argue that "[Armour's] denial . . . should also be disregarded in the absence of some other evidence to support the denial of wrongdoing." Defs.' Reply (Armour) at 19 n.21. But Defendants fail to explain why Terzian's testimony prevails over Armour's on summary judgment, where the Court must refrain from making credibility determinations and construe every reasonable inference in Armour's favor.

that the company agreed to pay for her tuition)[35]; *id.* (disputing whether the information was confidential or proprietary).[36]

There are two exceptions.  First, Armour admits that she manipulated an email sent to Reposh to make it appear as if it was sent to her.  Pl. Armour's LR 56.1(b)(3)(B) Stmt. ¶ 84; *see* Armour Dep. (8/26/16) at 225:16–22.  But Defendants fail to indicate in their briefing how this conduct amounts to a breach of fiduciary duty.  A breach of fiduciary duty occurs where a fiduciary "solicit[s] his employer's customers for himself, entice[s] coworkers away from his employer, or appropriate[s] his employer's personal property." *ABC Trans Nat. Transp., Inc. v. Aeronautics Forwarders, Inc.*, 379 N.E.2d 1228, 1237 (Ill. App. Ct. 1978).  A corporate fiduciary breaches its duty "if it uses corporate assets to further its own goals or enhances its own personal interests at the expense of the corporate interests." *Tully v. McLean*, 948 N.E.2d 714, 739 (Ill. App. Ct. 2011).  To that end, Defendants cite a number of cases that involve fiduciaries misusing company assets for their own personal gain.  Defs.' Mem. (Armour) at 28.  But there is no indication

---

[35]    Defendants construe Armour's testimony as claiming an oral modification of her written employment contract, which provided that she would be reimbursed for tuition for MBA courses and could only be modified in writing assigned by all parties.  Defs.' Reply (Armour) at 20.  There are two problems with this argument.  First, it assumes that Armour is claiming that the parties orally modified her employment agreement, as opposed to entering into a separate, oral agreement.  And second, it assumes that an authorized (albeit contractually ineffective) modification would amount to breach of fiduciary duty, without providing any support for such a position.

[36]    As Defendants point out, Armour admitted to sending company emails to third parties.  Defs.' Reply (Armour) at 20.  Armour, however, testified that the emails did not contain confidential or proprietary information, Pl. Armour's LR 56.1(b)(3)(B) Stmt. ¶ 72, and Defendants have not presented any argument as to why they did.

that Armour's manipulation of the email in question had this effect. Thus, summary judgment with relation to this conduct is not warranted.

Second, Armour admits that she ordered a background check on a non-employee through a third-party vendor at no charge, Pl. Armour's LR 56.1(b)(3)(B) Stmt. ¶ 82; *see* Armour Dep. (8/26/16) at 216:4–15, and that she ordered surveillance on certain employees, Pl. Armour's LR 56.1(b)(3)(B) Stmt. ¶ 82. Again, Defendants fail to demonstrate that this conduct was a breach of fiduciary duty. For these reasons, Defendants' motion for summary judgment on their breach of fiduciary counterclaims is denied.

Homer Tree Service's and Homer Management's unjust enrichment and conversion counterclaims are similarly predicated on their position that Armour was not authorized to use company funds to cover tuition for bachelor's degree courses. But, as noted above, Armour genuinely disputes this position on the ground that she reached an oral agreement with Reposh that she could use company funds for this purpose. Pl. Armour's LR 56.1(b)(3)(B) Stmt. ¶¶ 71–72; *see id.* ¶¶ 78–81. Accordingly, summary judgment on these counterclaims is denied as well.

## II. Castro

### A. Retaliation in Violation of 42 U.S.C. § 1981

In Count VI of Plaintiffs' amended complaint, Castro similarly alleges that she was terminated in retaliation for her complaints to Reposh about his policy of refusing to consider African-American candidates for employment because of their race. Defendants raise a number of challenges to her claim, several of which are

45

unavailing for reasons explained in connection with Armour's claim that need not be repeated here.[37] Others, however, require independent consideration.

First, Defendants move for summary judgment on Castro's claim as against Homer Tree Service, contending Homer Tree Service was not her employer. Defs.' Mem. (Castro) at 3 n.1; Defs.' Reply (Castro) at 4–5. Castro, however, makes no argument in her response brief that Homer Tree Service was her employer.[38] In response to one of Defendants' statements of fact, Castro summarily states that "she [ ] was the Director of Human Resources for all of the Homer entities," and cites to deposition testimony where she claims that she did work for all of them. Pl. Castro's 56.1(b)(3)(B) Stmt. ¶ 7; *see* Castro Dep. at 82:1–4. But this response is insufficient evidence from which a reasonable jury could find that Homer Tree Service was her joint employer based on the factors that must be assessed, as discussed *supra*. *See Love*, 779 F.3d at 703. Accordingly, Defendants' motion for summary judgment on Castro's § 1981 retaliation claim as against Homer Tree Service is granted.

With respect to the remaining Defendants against which Castro seeks relief (Homer Management and Reposh), Defendants also contend that, like Armour, Castro has presented insufficient evidence from which a reasonable jury could

---

[37] Specifically, Defendants argue that Castro did not engage in protected activity because there is no evidence of any specific African-American job applicants who were rejected, Defs.' Mem. (Castro) at 5–6; Defs.' Reply (Castro) at 7; and Castro's claims should be foreclosed by the "manager rule," Defs.' Mem. (Castro) at 7–8, Defs.' Reply (Castro) at 6–7. These arguments are rejected for the same reasons stated in connection with Armour's § 1981 retaliation claim.

[38] This omission is noteworthy in that Plaintiffs advance a number of arguments in relation to Armour's employers. Pls.' Resp. at 3–4.

conclude that her protected activity was the cause of her termination.[39]  But Castro has presented the same evidence from which a reasonable jury could infer that her objections to Reposh's discriminatory hiring policy caused her termination: namely, Reposh's threats of termination in response to her protected activity, the timing of her termination shortly after Moore's hiring, and the fact that Reposh fired Armour, who had engaged in the same protected activity, only days later.  Defs.' LR 56.1(a)(3) Stmt. (Castro) ¶ 24; Pls.' LR 56.1(b)(3)(C) Stmt. ¶¶ 47, 77; Defs.' Resp. Pls.' LR 56.1(b)(3)(C) Stmt. ¶ 18; Defs.' LR 56.1(a)(3) Stmts. J.A., Ex. BB, at 11.

And, while Defendants also point to legitimate, non-discriminatory reasons for Castro's firing, a reasonable jury could conclude that these reasons were pretextual.[40]  Defendants proffer two bases for Castro's termination: that she was unqualified to perform her duties as Director of Human Resources despite representing otherwise, and she exceeded the number of permissible absences during the time she worked for Homer Management.  Defs.' Mem. (Castro) at 12–13; Defs.' LR 56.1(a)(3) Stmt. (Castro) ¶ 75.  Castro, however, claims that she was responsible for overseeing human resources at Home Depot in her prior job.  Pl. Castro's LR 56.1(b)(3)(B) Stmt. ¶¶ 9, 75; *see* Castro Dep. at 195:9–15.  She also asserts that she did not exceed her allowable leave, pointing out that Homer Management paid out some of her remaining leave balance upon her termination.

---

[39]    As with Armour, the only adverse employment action on which Castro may proceed is her termination.  She has presented no facts from which a reasonable jury could conclude that she was subjected to any other treatment that would dissuade a reasonable employee from engaging in protected activity.  *See, e.g., Bagwe*, 811 F.3d at 889.

[40]    Like Armour, Castro does not attempt to prove her claim through the *McDonnell-Douglas* framework.

Pl. Castro's LR 56.1(b)(3)(B) Stmt. ¶ 71; *see* Castro Dep. at 222:3–21, 223:7–11. If a jury were to credit these assertions, they would call Defendants' stated reasons for Castro's termination into doubt.

Granted, Castro admits that she was aware that Reposh felt she was not qualified for her job prior to her termination, Pl. Castro's LR 56.1(b)(3)(B) Stmt. ¶ 71, and does not contest the number of days' leave she is alleged to have taken, *id*. But, even if a jury were to conclude that both stated reasons for Castro's termination had a basis in fact, it might nevertheless question their sincerity based on the timing of Castro's firing in connection with these rationales. Defendants have offered no explanation for why Reposh did not demand Castro's termination at a much earlier date, despite the stated bases for her termination existing well before August 18, 2015. According to Defendants, Armour complained about Castro's performance "[s]everal times during Castro's employment and approximately a month prior to" Castro's termination. Defs.' LR 56.1(a)(3) Stmt. (Castro) ¶ 74. Additionally, Reposh requested documentation of Castro's absences on August 17, 2015—one day prior to her termination—despite Castro purportedly exceeding her leave balance on March 5, 2017. *Id*. ¶ 73; *see* Castro Dep., Ex. 13. A reasonable jury might infer that Reposh summoned these rationales as a means of masking his intention to terminate Castro based on her protected activity, angered by Moore's hiring on August 17, the day before Castro was fired. Thus, a reasonable jury could conclude that Reposh instructed that Castro be fired because of her protected activity.

For all these reasons, Defendants' motion for summary judgment is granted with respect to Castro's § 1981 retaliation claim as against Homer Tree Service,[41] but denied with respect to her claim as against Homer Management and Reposh.

**B.    Section 20 of the IWA**

Defendants also move for summary judgment on Count VII of Plaintiffs' amended complaint, in which Castro alleges that she was terminated for refusing to participate in activities that would have violated various laws, rules, and regulations, as prohibited by § 20 of the IWA.  Specifically, Castro claims that she refused to participate in Reposh's policy of refusing to hire African-Americans, which she claims would violate § 1981, Title VII, and the IHRA.  Am. Compl., Count VII, ¶ 3.  In addition, she asserts that she "refused to follow or participate in other directives from Reposh . . . including, but not limited to"

> a. In July and August of 2015, directing that injured workers who invoked their rights under the Worker's [*sic*] Compensation Act be disciplined, retaliated against[,] and/or fired;
>
> b. Directing her to ignore, misclassify, refuse to pay overtime, or otherwise violate the federal Fair Labor Standards Act . . . and/or Illinois labor laws, at one or more of the Homer Companies; and
>
> c. Other directives by Reposh and/or the Homer Companies that Armour reasonably believed would violate other federal and/or Illinois laws, rules, or regulations, including tax laws, rules, and regulations.

*Id.*, Count VII, ¶ 4.  Defendants contend that Castro cannot prove her IWA § 20 claim as to any of these purported directives.

---

[41]    Because Castro has offered no basis from which a reasonable jury could conclude that Homer Tree Service is her employer, the Court grants Homer Tree Service's request for summary judgment with respect to her IWA § 20 claim, as well.  Defs.' Mem. (Castro) at 14 n.11.

### 1. Racially Discriminatory Hiring

Defendants first argue that Castro cannot sustain her IWA § 20 claim on the basis of refusing to participate in Reposh's practice of refusing to hire African-Americans. They contend, in pertinent part, that "[g]iven employment decisions were outside the scope of her employment, [Castro] could not have refused to participate in activity for which she was not authorized to partake." Defs.' Mem. (Castro) at 16; Defs.' Reply (Castro) at 16–17. Castro, like Armour, claims that she told Reposh that she "could not follow his illegal directives." Pls.' LR 56.1(b)(3)(C) Stmt. ¶ 12. But, again like Armour, Castro cannot demonstrate that she refused to participate in Reposh's practice. Castro admits that she did not have the authority to make hiring decisions. Pl. Castro's LR 56.1(b)(3)(B) Stmt. ¶¶ 31, 56. She further admits that she cannot identify any specific African-American applicant who applied for a position but was not hired by any of the Homer Companies. *Id.* ¶ 32. The closest Castro comes to evidence of refusal is her conduct at the February 2015 meeting at which she presented Reposh with applicants that she claims he rejected because they were African-American, notwithstanding her admonishment that he should consider them. Pls.' LR 56.1(b)(3)(C) Stmt. ¶ 14; Castro Dep. at 49:9–53:24. But there is no evidence that she then proceeded to consider or interview any of these applicants.[42] The record, therefore, at most demonstrates that Castro

---

[42] Castro testified that, following the meeting with Reposh, she forwarded the resumes and applications to Hocking, told him that there were many qualified applicants in the group, and "left him to review them." Castro Dep. at 50:14–23. She also testified that she forwarded an online application that Moore submitted to Hocking at a later date. *Id.* at 59:1–8. But, again, this does not establish that Castro refused Reposh's directive by interviewing, hiring, or otherwise considering the applicants herself. Even if it did, there is

complained to Reposh about his practice and verbally objected to it, not that she actually refused to participate in it. Thus, she cannot sustain an IWA § 20 claim on this basis, *Sardiga*, 948 N.E.2d at 657; *see Pignato*, 2013 WL 995157, at *5, and Defendants' motion for summary judgment as to this aspect of Castro's IWA § 20 claim is granted.

### 2. Retaliation Under IWCA

Next, Defendants contend that Castro cannot proceed with her IWA § 20 claim with respect to refusing to retaliate against employees who invoked their rights under the IWCA.[43]  As with Armour, Defendants maintain that there is no evidence in the record that Castro refused to engage in conduct that would violate the IWCA, Defs.' Mem. (Castro) at 17–18; Defs.' Reply (Castro) at 18–19, and that there is no evidence that any such conduct caused her termination, Defs.' Mem. (Castro) at 21.  Castro, however, has presented the same evidence as Armour that she was instructed to terminate or otherwise retaliate against any individuals who invoked workers' compensation, and she refused. Pls.' LR 56.1(b)(3)(C) Stmt. ¶¶ 43, 45.  In addition, she has presented evidence that she joined with Armour in voicing her refusal in the month before she was fired, and that, along with Armour, she informed Reposh at a meeting only days before they were terminated that they had contacted counsel and believed his directive to be unlawful, to which Reposh

---

no evidence that Reposh knew that she took this action.  Thus, no reasonable jury could conclude that he retaliated against her for taking it.

[43]     To the extent Castro joins in advancing a new claim that she refused to participate in insurance fraud, Pls.' Resp. at 13; Pls.' LR 56.1(b)(3)(C) Stmt. ¶¶ 39–42,  this claim was not included in Plaintiffs' amended complaint and will not be considered, as noted *supra*. *Anderson*, 699 F.3d at 997.

responded with anger. Pls.' LR 56.1(b)(3)(C) Stmt. ¶ 46. As with Armour, this is evidence from which a reasonable jury could conclude that Castro was terminated for refusing to follow Reposh's instruction to terminate or retaliate against individuals who received workers' compensation benefits.[44] With respect to this portion of Armour's IWA § 20 claim, therefore, Defendants' motion for summary judgment is denied.

### 3. Violations of "Other Federal or State Laws, Rules[,] or Regulations"

Defendants also contend that Castro cannot proceed with her IWA § 20 claim to the extent it is premised on refusing to participate in violations of the FLSA "and/or Illinois labor laws," or on "[o]ther directives by Reposh that . . . would violate other federal or state laws, rules[,] or regulations." *See* Am. Compl., Count VII, ¶¶ 4(b), 4(c). Here, just as with Armour's claim, Castro's say-so is not enough. She has not cited a single provision of the FLSA or other law, rule, or regulation or explained why engaging in Reposh's directives would have violated it. She therefore has not satisfied her burden of demonstrating that a violation of the FLSA

---

[44]  Defendants argue that, because Castro could not make termination decisions, she could not have refused to follow Reposh's instruction. Even accepting that Castro could not participate in termination decisions, however, Defendants have not indicated why Castro could not have otherwise retaliated against employees invoking workers' compensation, as is contemplated by the IWCA's anti-retaliation provision. 820 Ill. Comp. Stat. 305/4(h) (rendering unlawful an employer's action that would "interfere with, restrain or coerce an employee in any manner whatsoever in the exercise of the rights or remedies granted to him or her by this Act" or "discriminate . . . against an employee in any way"). Moreover, while Defendants claim that Castro has not put forth evidence that two particular employees had valid claims to benefits under the IWCA, Defs.' Mem. (Castro) at 18, Castro's claim is not confined to these employees. Defendants do not argue that Castro lacked the power to carry out Reposh's instructions, or that there were not employees who invoked their rights under the statute that Castro could have retaliated against.

would have occurred. *Corah*, 77 N.E.3d at 1043; *see Reed*, 2016 WL 1019830, at *4; *see also Ulm v. Mem'l Med. Ctr.*, 964 N.E.2d at 641. Defendants' motion for summary judgment as to this portion of Castro's IWA § 20 claim is therefore granted.

<u>Conclusion</u>

For the foregoing reasons, Defendants' motions for partial summary judgment as to Armour [146] and summary judgment as to Castro [149] are granted in part and denied in part. Defendants' motion as to Armour is granted as to Armour's IWA claims, except those based on the IWCA and OSHA (Count II), granted as to her assault and battery claims as against the Homer Companies (Count V), and denied in all other respects. Defendants' motion as to Castro is granted as to her claims against Homer Tree Service (Counts VI and VII); granted as to Castro's IWA claims, except as based on the IWCA, as against Homer Management and Reposh (Count VII), and denied in all other respects. The parties shall be prepared to set dates for pre-trial motions, the final pretrial conference, and trial at the next status hearing, which is set for 11/7/17 at 9:00 a.m.

**IT IS SO ORDERED.**                    **ENTERED**


**10/24/2017**                    **/s/ John Z. Lee** _____
                                  **John Z. Lee**
                                  **United States District Judge**